See *Ellis vs. Wilcox, ante*, 236.

---

JOHN McKEAGUE, by his Guardian, T. A. LLOYD, *vs.* A. KENNEDY.

APPEAL FROM DECISION OF THE CHANCELLOR.

APRIL TERM, 1885.

JUDD, C. J.; McCULLY and AUSTIN, JJ.

A sale of a sugar plantation, at an exaggerated price, to a person whom the vendor knew to be of impaired mind, set aside.

Decree of the Chancellor affirmed.

OPINION OF THE FULL COURT.

In our view, the law as held by the Chancellor in his carefully written opinion in this case, is indisputable, namely, that if it appear that advantage has been taken of a person of weak or

impaired mind to consummate with him an unconscionable bargain, equity will set it aside. We have very carefully endeavored to view the transaction, in accordance with values and the prospects of sugar plantation property at the time of the sale and mortgage in question. We intend to guard against now reversing a bargain which might have been fair at the time, but which the subsequent course of business has proved to be disadvantageous. But bearing this in mind, under all the circumstances and facts of the case, as stated in the opinion of the Chief Justice, and as we further find them in the record of evidence, we must find that the transaction between the parties was then unconscionable. The effect of the evidence is to convince us that Kennedy sold for a very high price his interest in a property which from the beginning had yielded him no dividends and placed him under considerable liabilities. He had previously sold a quarter for the nominal sum of $15,000, of which it may be said he had never been paid any part, for $10,000 was set against this as being the amount which he owed the plantation, barely upon McKeague's statement of that amount, and the remainder was settled by note, which remained unpaid, and was added to the amount of the mortgage given for the second quarter, the sale of which we are now considering. Setting aside the valuation of the property, as given by the defendant's testimony, the preponderance of the evidence strongly sustains the fact that the valuation that his share was sold for was grossly exaggerated.

We are equally of opinion that McKeague at that time was not in a mental condition suitable for important business transactions, and that Kennedy was well aware of this.

The decree of the Chancellor is affirmed.

*A. S. Hartwell,* for plaintiff.

*F. M. Hatch,* for defendant.

Honolulu, May 23, 1885.

DECISION OF THE CHANCELLOR, APPEALED FROM.

This is a bill in equity to cancel the mortgage made to defendant by John McKeague. The essential allegations are that it appears by an agreement, dated 11th June, 1875, that plaintiff and defendant were partners, and that the Heeia Sugar Plantation

was owned by them in equal shares; that defendant was then owing plaintiff $10,000, and agreed to pay the same in six months, and in default of such payment would assign to plaintiff one-fourth of the plantation and of its profits. That, on the 20th February, 1879, defendant conveyed to plaintiff, for the consideration of $15,000, one undivided fourth of the plantation, subject to plaintiff's assuming a like share of the debt on account of the estate, which then amounted to over $70,000. That, on 1st July, 1881, plaintiff and defendant made a mortgage to H. Macfarlane & Co. to secure payment of $20,000, and further advances up to $40,000 in all. That at this last date the partnership of plaintiff and defendant owed H. Hackfeld & Co., on account of the plantation, $41,704 70, secured by a mortgage dated 30th September, 1879. That on 24th September, 1881, the defendant sold to plaintiff his remaining undivided fourth of the plantation for $50,000, and plaintiff gave defendant a mortgage of the plantation to secure payment of $54,500, as evidenced by promissory notes as follows: $2,500 in nine months: $2,500 in twelve months : $5,000 in two years : $40,000 in five years thereafter, with interest thereon at 9 per cent. per annum. (This sum of $54,500 was purchase money, $50,000, and balance of sale of the first one-fourth, $4,500).

That on the 30th June, 1882, plaintiff sold the plantation to the Heeia Sugar Plantation Company, a corporation. That on the 2d February, 1884, plaintiff, by his guardian, brought a bill in equity against the Heeia Sugar Plantation Company and M. Neisser, its agent, which resulted in a decree annulling the conveyance to the corporation, and declaring it void on the ground of fraudulent representations and mental incapacity of the plaintiff. That at and long before the date of the mortgage to the defendant (24th September, 1881), the plaintiff was in a condition of mental incapacity for the transaction of important business, and did not know or comprehend the nature and effect of his act in making the mortgage and notes, and that the consideration for the mortgage was grossly disproportioned to the value of the property, and that the plaintiff was induced to make the mortgage by the suggestion, contrivance and undue influence of defendant, who took an unfair and dishonest advantage of the plaintiff's mental

incapacity, well knowing the circumstances, and that the total liabilities assumed by the plaintiff was then over $70,000, and which he was utterly unable to pay. The plaintiff offers to reconvey the said one-fourth of the plantation to the defendant on his repaying plaintiff $14,000, and interest received by him from the plaintiff, and reimbursing plaintiff his share of the expense, and assuming his share of the liabilities.

The defendant's attorney in fact, Samuel M. Damon, answered October 14, 1884, and the defendant, who is a resident of Belfast, Ireland, also made answer, received here and filed on the 9th February, 1885. These answers fully detail the business relations of plaintiff and defendant, showing that in 1859 plaintiff, who is defendant's nephew, was started by defendant in business on a small farm in Nuuanu Valley, and McKeague started a sugar plantation on this farm, and in 1865 defendant joined him in it, and a year or two later they commenced the Heeia Plantation, and moved the machinery thither, and carried the plantation on. No written articles of copartnership were made, but the parties held equal undivided moieties. In the year 1870, the parties settled their rights by a deed, and defendant went to Ireland, and returned in 1871, and went again to Ireland in 1872, and returned to this Kingdom in 1878. That in that year the parties made a settlement of their affairs. That during all this time McKeague had the sole management of the plantation, and kept no partnership accounts, and defendant had no means of knowing whether he owed McKeague the $10,000, as claimed by him, but that he took McKeague's word for this, and completed the transaction of the sale of the first one-fourth, as set forth in the bill of complaint. That in 1880 defendant again returned to Honolulu, and endeavored to sell his remaining fourth, because, although defendant had advanced several sums of money from time to time to carry on the plantation, he had never received any dividend or share of profits; but that McKeague had been drawing out such moneys as he required for his personal use, besides a salary, which amounted in two years to about $18,000, for which McKeague could give no account. The defendant then proposed to sell his remaining fourth; that defendant said he would give time to pay the balance of the purchase money, if $10,000 was

paid down, and that McKeague said he would not give more than $50,000 for the remaining one-fourth, and that defendant had not mentioned any price to him, but subsequently defendant had told plaintiff he would take the sum offered, and the transaction was completed. The answer avers that the sum of $50,000 was a fair and honest price, admits the payment of $10,000 of the purchase money, and that $40,000 is owing, with over a year's interest.

In regard to the mental condition of McKeague, the answer admits that McKeague had met with an accident between 1878 and 1880, which affected his health, and that in 1880 defendant observed a change in McKeague's mental and bodily condition, but that in 1881 McKeague had gone to San Francisco for a sea voyage and on his return "he was decidedly a great deal better in body and mind and was like what he had formerly been," and that during all the negotiations McKeague was perfectly cognizant of everything and competent to judge for himself. The allegations in the bill as to the mental incapacity, undue influence, and that the consideration in the mortgage is grossly disproportioned to the property, etc., are denied.

Without referring to the evidence in detail, embracing as it does much that was taken and by me fully discussed in the case of *McKeague vs. Neisser et al.* (May, 1884, not reported), I am of the opinion that McKeague was at the time of the transaction between him and defendant, which resulted in the mortgage now attacked, in a weak condition of mind, rendering him incapable of passing correct judgment on important business matters.

The defendant admits that he had observed in 1880 that Mc-Keague was weakened in both mental and physical condition, but that in 1881 he had recovered as the result of a voyage to San Francisco and back.

It is in evidence that Dr. Kennedy was in 1881 residing at Heeia, where he held a commission from the Board of Health; that he frequently made remarks about McKeague's condition, once stating, when he observed McKeague mounting his horse with great difficulty, that he seemed to be paralyzed on one side of his body and head, and that if McKeague did not settle affairs satisfactorily with him he would have him put into an insane asylum and get a competent man to manage the plantation; that

Kennedy was dissatisfied with McKeague's management of the plantation, and even mentioned the name of a desirable successor to the management.

These witnesses say that the only difference in McKeague's condition after his return from San Francisco was that his complexion was fairer, that his mental condition was unchanged—was as it had been since the fall from his horse.

I must consider Kennedy as having full opportunities of judg-. ing of McKeague's weak mental condition, and that he, being a physician of experience and having had a long personal acquaintance with McKeague, who was not only his nephew but his partner, did have actual knowledge of his condition. He says he was anxious to close out his interest and return to Ireland, because he could get no dividends or profits from the plantation. He even had to put into the mortgage now under contention, to be secured, the sum of $4,500 balance of former sale of one-quarter interest. This McKeague had been unable to pay him, and I think this is inconsistent with his answer and deposition that $50,000 was a fair and honest price for one-quarter of the plantation and that the whole plantation was worth from $200,000 to $250,000.

But the plantation then owed $66,948 13 and McKeague undertook to bear this in addition to the $54,500. This would put the plantation at a valuation of $271,348 13. It was assessed in 1881 at $135,310. Others testify that it was worth from $175,000 to $200,000. Mr. Henry Macfarlane says that he thought at the time that the price McKeague paid was "ridiculous." The plantation was run down, and he told McKeague it was a poor time to buy Kennedy out, and advised him to let him alone, and used all the arguments he could. McKeague said he would not buy, but bought without his knowledge. He says that in June, 1882, when Ross took charge, the plantation was worth about $125,000. It is remarkable that Kennedy was willing in 1879 to sell (three years after the Treaty of Reciprocity with the United States went into effect) at the rate of $60,000 for the plantation, and yet he considers the price he obtained two years later, at a rate of $271,000, was fair and honest.

There is evidence that in the year 1881 all plantation stocks and investments were high and the prospects of the sugar interest

very promising. And we have the evidence that about $200,000 was expended on the place between April, 1878, and June, 1881, and of this about $100,000 was in a new mill and other permanent improvements, and that in those years all but about $50,000 had been paid off from the crops. But it must be borne in mind that, though the mill was new and good and the crop at the time of McKeague's fall from his horse was a good one (about 500 tons), he neglected cultivation after that, and the plantation had run down so that it required great expenditure to bring it up again after Captain Ross took the management.

I think that Kennedy was insincere when he told Mr. Cecil Brown that he did not care to sell to McKeague. His answer and deposition show that he was anxious to get out of a matter that paid him nothing and burdened him with liabilities, and I am led by all the facts in the case to the conclusion that he took an unconscionable advantage of an enfeebled intellect to secure for himself a mortgage for an amount grossly disproportionate to the value of the property, taking everything into consideration.

That McKeague was greatly influenced in consenting to this bargain by the contemporaneous, alluring and fraudulent representations of Neisser, I cannot doubt. Of these negotiations Kennedy had some knowledge, for he says he told McKeague "to have nothing to do with Jews," when McKeague told him he was going to sell out to a California company for $1,000,000.

In a case decided by me July 3, 1884, *Apahu vs. Feary*, not reported, I had occasion to define the principles upon which equity will interfere where great advantage is taken of a weak intellect to secure an unconscionable bargain with a grossly disproportionate consideration. In such cases imposition or undue influence will be inferred.

I find such circumstances in this case, and am of the opinion that the mortgage under consideration should be cancelled.

Decree accordingly.

*A. S. Hartwell* and *W. R. Austin*, for plaintiff.

*F. M. Hatch*, for defendant.

Honolulu, March 12, 1885.